**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

AVINOAM ROSENFELD, as Trustee of the
Michael Bluth Irrevocable Life Insurance Trust,

        Plaintiff,

    v.

THE LINCOLN LIFE INSURANCE COMPANY
AND WILLIAM SEGAL,

        Defendant.

C.A. No.: 2:16-CV-01549-LDW-AYS

---

**DEFENDANT THE LINCOLN NATIONAL LIFE INSURANCE COMPANY'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION TO REMAND**

Paul M. Hummer (admitted *Pro Hac Vice*)
Valerie G. Pennacchio
**SAUL EWING LLP**
One Riverfront Plaza
Suite 1520
Newark, New Jersey 07102

*Counsel to Defendant The Lincoln National
Life Insurance Company, improperly plead
as the Lincoln Life Insurance Company*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS RELEVANT TO MOTION TO REMAND ....................................... 2

    A.    The Relationship Between Rosenfeld, William Segal and His
           Father Herman Segal ........................................................................... 2

    B.    Rosenfeld and The Segals Work Together Regarding The Bluth Trust,
           The Bluth Policy And This Lawsuit ........................................................ 5

LEGAL ARGUMENT ....................................................................................................... 12

POINT I ........................................................................................................................ 12

        REMAND IS IMPROPER UNDER 28 U.S.C. §1447(E) AS
        PLAINTIFF'S SOLE MOTIVE IN ADDING SEGAL AS A DEFENDANT
        POST-REMOVAL WAS TO DEFEAT DIVERSITY ...................................... 12

POINT II ....................................................................................................................... 16

        REMAND IS IMPROPER AS PLAINTIFF'S ADDITION OF SEGAL AS A
        DEFENDANT CONSTITUTES FRAUDULENT JOINDER ........................... 16

    A.    Plaintiff Does Not Have a Colorable Claim against Segal Because
           Plaintiff Has Not Sustained The Injury For Which He Seeks
           Damages From Segal ......................................................................... 18

    B.    The Averments Of The Amended Complaint Are Demonstrably False .................. 19

    C.    Plaintiff's Conduct Evidences That He Has No Good Faith Intention
           Of Prosecuting His Claim Against Segal ................................................ 20

POINT III ...................................................................................................................... 22

        PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES SHOULD BE DENIED .......... 22

CONCLUSION ............................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abels v. State Farm Fire & Cas. Co.*,
    770 F.2d 26 (3d Cir. 1985)................................................................................17

*Alphonse v. Omni Hotels Management Corp.*,
    757 F. Supp. 722 (E.D. La. 1991)....................................................................18

*Amon v. Nelson*,
    1992 WL 8337 (S.D.N.Y. Jan. 15, 1992) .........................................................14

*Aries Ventures Ltd. v. Axa Fin. S.A.*,
    696 F. Supp. 965 (S.D.N.Y. 1988) ...................................................................14

*Arno v. Costa Line, Inc.*,
    589 F. Supp. 1576 (E.D.N.Y. 1984) .................................................................17

*Arriaga v. New England Gas Co.*,
    483 F. Supp. 2d 177 (D.R.I. 2007)..............................................................17, 18

*Bailey v. Bayer CropScience L.P.*,
    563 F.3d 302 (8th Cir. 2009) ...........................................................................13

*Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev.,
    Inc.*,
    448 F.3d 138 (2d Cir. 2006).............................................................................17

*Boyd v. Diebold, Inc.*,
    97 F.R.D. 720 (E.D. Mich. 1983) .....................................................................15

*Boyer v. Snap-on Tools Corp.*,
    913 F.2d 108 (3d Cir.1990)..............................................................................17

*Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*,
    15 N.Y.3d 264, 933 N.E.2d 738 (2010)...........................................................19

*Doe v. Cutter Biological*,
    774 F.Supp. 1001 (E.D. La. 1991) ...................................................................17

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2015 WL 3776385 (S.D.N.Y. June 17, 2015) ..................................................18

*Gerbo v. Kmart Corp.*,
    2015 WL 6691603 (E.D.N.Y. Nov. 3, 2015).....................................................18

*Gursky v. Northwestern Mut. Life Ins. Co.*,
   139 F.R.D. 279 (E.D.N.Y. 1991) ......................................................................15

*Illinois Cent. R.R. Co. v. Sheegog*,
   215 U.S. 308 (1909)..........................................................................................18

*Jackson Nat. Life Ins. Co. v. Ligator*,
   949 F. Supp. 200 (S.D.N.Y. 1996) ...................................................................19

*Kuperstein v. Hoffman-Laroche, Inc.*,
   457 F. Supp. 2d 467 (S.D.N.Y. 2006)..........................................................18, 22

*Little Rest Twelve, Inc. v. Visan*,
   829 F.Supp.2d 242 (S.D.N.Y.2011)...................................................................22

*Locicero v. Sanofi–Aventis U.S. Inc.*,
   2009 WL 2016068 (W.D.N.Y. Jul. 10, 2009)....................................................18

*Martin v. Franklin Capital Corp.*,
   546 U.S. 132 (2005)..........................................................................................22

*McGee v. State Farm Mut. Auto. Ins. Co.*,
   684 F. Supp. 2d 258 (E.D.N.Y. 2009) ...................................................13, 14, 15

*Mihalakis v. Cabrini Med. Ctr. (CMC)*,
   151 A.D.2d 345, 542 N.Y.S.2d 988 (1st Dep't 1989) .........................................19

*Moncion v. Infra–Metals Corp.*,
   2002 WL 31834442 (S.D.N.Y. Dec. 18, 2002) ..................................................13

*Nazario v. Deere & Co.*,
   295 F. Supp. 2d 360 (S.D.N.Y. 2003)................................................................14

*Norwalk v. Air-Way Elec. Appliance Corp.*,
   87 F.2d 317 (2d Cir. 1937)................................................................................18

*B.N. ex rel. Novick v. Bnei Levi, Inc.*,
   2013 WL 168698 (E.D.N.Y. Jan. 15, 2013) .......................................................18

*O.M. v. CEC Entm't Concepts, L.P.*,
   2016 U.S. Dist. LEXIS 28150 (E.D.N.Y. March 2, 2016) ..................................18

*Pacific Gas & Electric Co. v. Fibreboard Products*,
   116 F.Supp. 377 (D.Cal. 1953) .........................................................................15

*Pampillonia v. RJR Nabisco, Inc.*,
   138 F.3d 459 (2d Cir. 1998)..........................................................................16, 17

*Principal Life Ins. Co. v. Arnold Young, et al.*,
2:14 cv 00198-SRC-CLW (D.N.J.) ........................................................................6

*In re Propecia (Finasteride) Prod. Liab. Litig.*,
2016 WL 3541543 (E.D.N.Y. June 23, 2016) ......................................................18

*Schur v. L.A. Weight Loss Centers, Inc.*,
577 F.3d 752 (7th Cir.2009) .................................................................................13

*Schwenn v. Seare, Roebuck & Co.*,
822 F. Supp. 1453 (D. Minn. 1993) ......................................................................17

*Shaw v. Munford*,
526 F. Supp. 1209 (S.D.N.Y. 1981) ......................................................................14

*Steel Valley Auth. v. Union Switch & Signal Div.*,
809 F.2d 1006 (3d Cir. 1987) ..........................................................................13, 14

*Syme v. Rowton*,
555 F. Supp. 33 (D. Mont. 1982) ..........................................................................15

*Young v. Segal*,
2:14-cv-01997-SRC-CLW (D.N.J.) ........................................................................6

*Zhaoyin Wang v. Beta Pharma, Inc.*,
2015 WL 5010713 (D. Conn. Aug. 24, 2015) ......................................................18

*In re Zyprexa Prod. Liab. Litig.*,
2008 WL 4561628 (E.D.N.Y. Oct. 10, 2008) .......................................................17

**Statutes**

28 U.S.C. § 1447(c) ........................................................................2, 3, 16, 22

28 U.S.C. § 1447(e) ........................................................................1, 13, 14, 16

**Other Authorities**

Fed. R. Civ. P. 11 ........................................................................1, 20

## <u>INTRODUCTION</u>

This is an action challenging the lapse of a life insurance policy issued on the life of Michael Bluth ("Bluth Policy"). Plaintiff Avinoam Rosenfeld is the Trustee of the Michael Bluth Irrevocable Life Insurance Trust ("Bluth Trust"), which nominally owned the policy. The Bluth Policy lapsed in 2014 for non-payment of premium.

Plaintiff filed suit against Lincoln in New York state court seeking reinstatement of the Bluth Policy. Lincoln timely removed the action to this Court on the basis of diversity of citizenship. Following removal, Plaintiff filed an Amended Complaint adding as a defendant William Segal, a New York resident. Segal was the producer of the Bluth Policy and the Amended Complaint avers that Segal made misrepresentations concerning premiums due, that the Trust made premium payments in reliance upon Segal's misrepresentations, and that the Trust lost the value of those premium payments based upon Segal's misrepresentation of amounts due prior to lapse. The Amended Complaint seeks to recover as damages from Segal the value of the premiums payments purportedly made by the Bluth Trust. At the time Plaintiff proposed amendment, Lincoln did not believe, consistent with its Rule 11 obligations, that it had sufficient grounds to oppose amendment. As set forth below, subsequent discovery and the Plaintiff's actions in this lawsuit establish that Plaintiff and Segal are acting in concert with respect to the lawsuit, that Segal was added improperly to the lawsuit for the sole purpose of defeating diversity, that the averments of the Amended Complaint are in fact false and that Plaintiff has no good faith intent to prosecute a claim against Segal.

Plaintiffs Motion to Remand should be denied. Plaintiff's Motion does not address in any fashion 28 U.S.C. § 1447(e), which controls review of the joinder of a non-diverse defendant following removal. Pursuant to section 1447(e), the Court should respond to the Motion to Remand by denying the joinder of Segal as a defendant. In the alternative, under the standards

for fraudulent joinder applicable to a Motion to Remand under 28 U.S.C. § 1447(c), the Court should deny the Motion to Remand on the grounds that: (1) the Plaintiff has no cause of action against Segal; (2) the Amended Complaint contains false averments of fact; and (3) the Plaintiff has no good faith intent to prosecute the action against Segal.  As set forth at length below, Plaintiff's deposition testimony and the facts of record create a substantial record from which this Court can and should conclude that the underlying insurance transaction was a fraud orchestrated by defendant Segal with assistance and complicity from Plaintiff.  The facts and circumstances of the addition of Segal to this lawsuit make it clear that his joinder is a further sham intended solely to deprive the Court of its jurisdiction.   Plaintiff's Brief is noteworthy for its complete failure to address any of the factual issues set forth below, all of which were necessarily known to Plaintiff prior to the filing of his Motion.

<u>STATEMENT OF FACTS RELEVANT TO MOTION TO REMAND</u>

A.      **The Relationship Between Rosenfeld, William Segal and His Father Herman Segal**

Herman Segal is currently the subject of a contentious bankruptcy proceeding.  The Trustee in the Herman Segal bankruptcy has filed an  Adversary Complaint against Rosenfeld. In that complaint the Trustee identifies Segal as a disbarred lawyer and convicted felon who, after he was released from prison, engaged in various fraudulent or illegal businesses, including what the Trustee characterizes as a series of fraudulent transactions involving life insurance, some of which involve Rosenfeld and many of which are strikingly similar to the dispute at the center of this action.  The Trustee alleges, in his Adversary Complaint against Rosenfeld, that Herman Segal "is or was involved in numerous transactions involving life insurance policies and life insurance trusts" and that these transactions "were made on account of investor-originated life insurance ('IOLI') or stranger-originated life insurance ('STOLI') transactions", which run

afoul of state insurable interest laws and are illegal under New York law.  [Ex. A at Lincoln 26, pp. 2, 24-27[1]]

The Adversary Complaint against Rosenfeld quotes a decision from a New York state court to describe a STOLI transaction as follows:

> [A] policy is purchased, not with a view of the insured paying premiums for the benefit of the insured's family, but with a view toward reselling the policy to an "outside investor" in a secondary market for life insurance.  The outside investor pays the insured in order to make a "wager" on the duration of the insured's life. . . .  Under New York law, as well as long-standing public policy recognized by New York courts, it is illegal for anyone to procure, or cause to be procured, a life insurance policy on an insured for the benefit of an outside investor who does not have an insurable interest in the insured. To conceal the real policyholder's lack of insurable interest from the insurer, as well as to induce the insured's application, investors establish an irrevocable trust solely to hold the target insurance policy.  The trust is established around the time that the insured submits his application, and is named as the owner and beneficiary of the policy with the beneficiary being entitled to the death benefits payable under the policy.  The beneficiary of the trust is typically disclosed to the insurer and designated as the insured or a family member.  Once the policy is issued, the insured transfers the beneficial interest in the policy to an outside investor in exchange for a significant lump sum payment.

[*Id.* at Lincoln 26, pp. 25-26, ¶ 92]

In the property schedules that Segal was required to file as part of his bankruptcy, Segal invoked his Fifth Amendment rights against self-incrimination in a number of areas, including in response to questions that asked him to identify "Interests in insurance policies" and "Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy or trust."  [*Id.* at Lincoln 23, Schedule B – Personal Property, items 9 and 20]  At his deposition, Rosenfeld acknowledged his awareness that Segal was asserting his Fifth Amendment rights in the bankruptcy proceeding.  [*Id.* at 226:14-19]

---

[1] A true and correct copy of the complete transcript of Rosenfeld's deposition is filed herewith as Exhibit A to the Declaration of Valerie G. Pennacchio.  Lincoln has filed herewith those exhibits from that deposition that are referenced in this Brief.  To avoid confusion, Lincoln has used the same numerical exhibit number for those exhibits.  Where appropriate, Lincoln has redacted medical information, social security numbers and partial bank account references in the copies of the exhibits that are being made part of the public record.

In the Adversary Complaint filed against Rosenfeld, the Trustee in Herman Segal's bankruptcy describes Rosenfeld as someone who has a "special relationship" with Segal. [*Id.* at Lincoln 26, ¶ 119] Rosenfeld helped Segal find his bankruptcy lawyer and advanced the fees paid to that lawyer, paying the fees with his wife's credit card. [*Id.* at 157:2-157:12; 221:23-222:16] Rosenfeld also appeared and testified as a witness for Herman Segal in Segal's attempt to have the Bankruptcy dismissed; an action the Trustee opposed and the Bankruptcy Court denied. [*Id.* at Lincoln 24, 23:23-27:4]

Rosenfeld, who is a lawyer, testified that Herman Segal was both a client of his and also someone with whom he had various business relationships. [*Id.* at 19:4-21:5][2] In a deposition taken by Herman Segal's bankruptcy Trustee, Rosenfeld testified that he had spoken with Herman Segal on average two or three times per week for the prior six months, that he had met with Segal twelve or sixteen times in the prior six months, that he had been to Segal's house four

---

[2] Rosenfeld was generally evasive throughout his deposition but particularly so about his relationship with Herman Segal. For example, when asked whether he had previously testified in a deposition, Rosenfeld testified to two unrelated proceedings (one more than ten years ago) and then purported not to be able to "recall at the moment" any other deposition until he was directly asked whether he had been deposed by the Trustee in the Herman Segal bankruptcy, a deposition that occurred in June 2014. [Ex. A at 7:24-9:25 and Lincoln 25] Similarly, when asked whether he had ever been a party in another lawsuit, he testified that "I can't recall" but then acknowledged when asked directly that he was a defendant in a currently pending action for fraudulent conveyance brought by the Trustee in Herman Segal's bankruptcy. [*Id.* at 10:7-12] Similarly, when asked whether he had ever testified in any hearing or trial, Rosenfeld testified "I don't believe so. But I can't say that with a hundred percent degree of certainty" but then acknowledged when asked directly that he had in fact testified as a witness called by Herman Segal at a hearing in Segal's bankruptcy. [*Id.* at 10:19-11:8] When asked if he had loaned money to Segal, Rosenfeld testified "I lent him a few dollars here and there" but claimed not to be able to recall whether there was one loan or multiple loans or what the purpose of the loan(s) was. [*Id.* at 21:6-22:11 ] In a deposition in the Segal bankruptcy, however, Rosenfeld testified that Segal owed him "about $200,000," for "life insurance policies he owed me on." [*Id.* at Lincoln 23 20:4-10] Rosenfeld's lawyer ultimately instructed him not to answer further questions about his relationship with Herman Segal. When Rosenfeld was asked whether he and his lawyer had discussed on a break, while Rosenfeld was under oath, how to respond to questions about Segal, Rosenfeld's counsel also instructed him not to answer that question. [*Id.* at 233:22-236:9]

or five times in the prior six months and that he and Mr. Segal had a "personal" relationship in addition to a professional relationship.  [*Id.* at 27:5-14 and Lincoln 25, 9:10-10:16.]

The suit by the Trustee against Rosenfeld arises out of Rosenfeld's acknowledgement that Segal "gave him a life insurance policy" to satisfy a $200,000 debt that Segal owed to Rosenfeld related to various life insurance policies. [*Id.* at Lincoln 26, ¶¶ 121, 122 and Lincoln 27, ¶¶ 121, 122]  Rosenfeld testified that he is currently negotiating with the bankruptcy Trustee the amount that the trustee will receive from the death benefit recently paid on the policy to address the Trustee's claim that the transfer from Segal to Rosenfeld was fraudulent.  [*Id.* at 30:9-31:8]  Rosenfeld testified that he also has an interest in another life insurance policy that "Segal transferred over to me." [*Id.* at 34:9-36:17][3]

William Segal is Herman Segal's son.  [*Id.* at 49:25-50:8]  William Segal is the producer who submitted the application to Lincoln for the Bluth Policy.  [*Id.* at Lincoln 4]   In submitting the application on the Bluth policy, William Segal identified himself as acting on behalf of Signature Capital Group, with an address in Brooklyn.  [*Id.*]   William Segal gave Rosenfeld space to use as an office at that same location rent free.  [*Id.* at 51:17- 52:16, 53:4-10; 99:5-14; 150:23-151:18]  As discussed below, William Segal had substantial involvement in the Bluth Policy and Rosenfeld's activities in connection with that policy.

**B.      Rosenfeld and The Segals Work Together Regarding The Bluth Trust,  The Bluth Policy And This Lawsuit**

There is ample evidence that Rosenfeld is working in tandem with William Segal and his father Herman Segal in all matters related to the Bluth Trust, including this lawsuit.  As set forth

---

[3] Rosenfeld admitted to an "investment interest" in another life insurance policy pursuant to which he will receive a payment if the insured dies while the policy is in force and to an investment in yet another policy which he no longer holds.  [Ex. A at 56:3-59:18]

below, there is also significant evidence that the Segals, and later Rosenfeld and Segal, have engaged in fraud with respect to the Bluth Policy.

The Application for the Bluth Policy submitted by William Segal answered "No" to questions about whether the proposed insured had been involved in any discussion about the possible sale or assignment of the certificate and whether the certificate was being funded with funds borrowed, advanced or paid from another person or entity.  [*Id.* at Lincoln 4, page Bluth 00107-08]  William Segal provided comparable certifications.  [*Id.* at Lincoln 4, page Bluth 00115]  As set forth below, Rosenfeld's testimony is that <u>all</u> of the premium payments that occurred while he was trustee were paid for by Segal or others.  The documentary record establishes that a number of payments were also made by Herman Segal. [4]

---

[4] There are other significant indicia of fraud in the creation and administration of the Bluth Trust. The original Trustee was Jeffrey Kret, someone Rosenfeld knew. [Ex. A. at 76:9-13] Jeffrey Kret is a defendant in one of several lawsuits arising from alleged fraud and STOLI transactions involving Herman Segal and a life insurance policy produced by Signature Capital Group insuring the life of Arnold Young.  *Principal Life Ins. Co. v. Arnold Young, et al.*, 2:14 cv 00198-SRC-CLW (D.N.J.); *Young v. Segal*, 2:14-cv-01997-SRC-CLW (D.N.J.).  The two actions allege that Principal Life was defrauded into issuing a life insurance policy on the life of Young held by a trust for which Kret was the Trustee and financed by persons who had no insurable interests in Young's life and that Young, in turn, was a participant in the transaction because of fraudulent representations to him by Herman Segal.  For the Court's convenience, copies of the Complaints in both actions are filed herewith as Exhibits B and C.

Rosenfeld produced in discovery various non-conforming copies of the Bluth Trust, each of which purports to have notarized signatures from Bluth and Kret but with different notarial certifications.  The document marked as Lincoln Exhibit 1 at Rosenfeld's Deposition is notarized by Alan Rubenstein.  (Ex. A. at Lincoln 1, p. 19, Bluth 00045) The Trustee in Herman Segal's bankruptcy has averred in an Application to Examine various individuals, including both Rubinstein and Rosenfeld, that "Rubenstein has been accused in numerous actions across the country of fraud and malfeasance with respect to the handling of life insurance trusts." (*Id.* at Lincoln 2 pp. 2-3)  The Application to Examine related to yet another life insurance trust involving Herman Segal in which Rubenstein replaced Rosenfeld as the Trustee.  *Id.* at Lincoln 2, p. 4 ¶¶ 7-10.  Rosenfeld confirmed in his deposition that he knew Rubenstein "professionally" and that Rubenstein had succeeded him as trustee on at least one other life insurance trust.  [*Id.* at 84: 15-86:8]

A different copy of the Trust has the signatures notarized by Yocheved Simon.  The adversary action filed against Rosenfeld by the Trustee in Herman Segal's bankruptcy alleges

Rosenfeld did not know Michael Bluth and was not aware of the Bluth Trust prior to the time he became trustee.  [*Id.* at 72:17-21; 73:3-5]  Rosenfeld, who was successor to the original Trustee, was asked to be the Trustee of the Bluth Trust by William Segal.  [*Id.* at 72:24-73:2]  In discovery Lincoln obtained various emails in which William Segal instructed Rosenfeld on what documents to sign in order to have his appointment as successor trustee recognized by Lincoln.  [*Id.* at Lincoln 8, 9 and 10]  Notably, Herman Segal was also involved in this email correspondence.  [*Id.* at 152:3-153:18 and Lincoln 10]  Rosenfeld admitted in his deposition that he and William Segal discussed the potential for finding investors in the secondary market for the Bluth Policy and that he complied with whatever requests Segal made of him in that regard.  [*Id.* at 242:17-243:9]  For example, Rosenfeld obtained a life expectancy certificate on Michael Bluth at William Segal's request.  [*Id.* at 247:20-248:4]

As compensation for his service as Trustee, Rosenfeld received what he characterized as a "legal fee" of $5,000.  [*Id.* at 40:20-41:2]  Rosenfeld purported not to be able to recall who paid him the fee or where the money to pay the fee came from.  [*Id.* at 43:5-44:16]  Rosenfeld also

---

that Yocheved Simon is also known as Yocheved Segal, the wife of Herman Segal, that she asserts that her husband has forged her signature and improperly used an expired notarial stamp in her name on "numerous occasions," and that Herman Segal has been forging notarial certifications for "at least 15 years."  [*Id.* at 106:3-24 and Lincoln 26, p. 29 ¶¶ 103-105]

Rosenfeld also produced in discovery various non-conforming documents purporting to constitute his appointment and acceptance as a successor Trustee.  Rosenfeld produced versions dated June 30, 2010 [*Id.* at Lincoln 6], February 2011 [*Id.* at Lincoln 7] and, as noted below, March 2014 [*Id.* at Lincoln 5].

Rosenfeld testified that he had never been a beneficiary of a life insurance trust and that he was not and never had been a beneficiary of the Bluth Trust.  [*Id.* at 18:9-19:3]  On various occasions, however, Rosenfeld executed documents related to the Bluth Trust purporting to be the sole beneficiary of the Trust.  For example, in March 2014, for reasons he was unwilling or unable to explain at his deposition, Rosenfeld signed an Amendment to the Bluth Trust appointing him as successor Trustee as "beneficiary" in a document that required the signature of the trust beneficiaries as evidence of their consent to his service as Trustee. [I at  107:5-110:16 and Lincoln 5, pp. Bluth 00149-150]  Similarly, Rosenfeld signed a request to use the Bluth Policy as collateral for a loan as the "irrevocable beneficiary" of the Bluth Trust.  [Id. at 254:3-255:5 and Lincoln 33]

purported not to recall whether he had any form of written fee agreement in connection with his service as Trustee.  [*Id.* at 83-22-25]  Rosenfeld testified, however, that he considered William Segal to be his client in connection with the Bluth Trust.  [*Id.* at 83:18-21]  At times in his deposition, whenever it was convenient, Rosenfeld would assert the attorney-client privilege to refuse to answer questions about his dealings with Segal concerning the Bluth Trust, the Bluth Policy and this lawsuit.  [*Id.* at 122:21-124:23 (refusing to answer a question about whether Segal told him to sign the acceptance of trustee form); 128:4-129:21 (refusing to answer a question about the substance of his conversations with William Segal about this lawsuit before it was filed); 132:20-133:4 (refusing to answer questions about the substance of any of his conversations with William Segal about the lawsuit); 138:20-139:2 (refusing to answer questions about the substance of his conversation with Segal about the fact that Rosenfeld was filing suit); 205:19-206:3 (refusing to answer questions about the substance of his conversation with Segal about what law firm to use for the suit)]

William Segal asked Rosenfeld, as Trustee, "to communicate [to Segal] when premium payments were due."  [*Id.* at 60:4-61:7]  Each time Rosenfeld got a notice from Lincoln that premium was due or that the policy would lapse if premium in a specific amount was not paid by a specific date[5], Rosenfeld would tell Segal what was due and the date by which it needed to be paid.  [*Id.* at 79:6-80:14]  Segal would then instruct Rosenfeld either that Rosenfeld should pay the premiums due or that the premiums would be paid by someone else.  [*Id.* at 62:4-63:6; 82:8-24 ]  The decision to pay and who would pay was always made by William Segal, not Rosenfeld.  [*Id.* at 82:16-24; 163:19-165:15]

---

[5] Notices of this type are referred to as "Grace Notices."

No trust assets were ever used to pay premiums and Rosenfeld never used any of his own money to make premium payments.  [*Id.* at 67:5-13; 71:19-72:10]  For those payments that were made by Rosenfeld as Trustee, the funds that were used to make the premium payment were deposited into Rosenfeld's bank account by Segal. [*Id.* at 63:11-64:11]  Rosenfeld did not know the source of the funds that Segal transferred to him.  [*Id.* at 63:11-19; 67:14-23]

With respect to premium payments made directly by others, Rosenfeld testified that he also did not know the source of the money used to make those payments.  [*Id.* at 67:24-68:6]  The only source Rosenfeld could identify for the money used to make premium payments was William Segal.  [*Id.* at 71:2-9]  The payments that Lincoln received for premiums due on the policy include a number of payments from Alpha Beta Omega Corp. with an address care of Segal, 4720 Pinetree Drive #15, Miami Beach Florida.  [*Id.* at Lincoln 11, pp. LN00123-125]  That is an address listed in Herman Segal's Bankruptcy Schedule A – Real Property as his property [*Id.* at Lincoln 23] and is identified in the Adversary Complaint filed against Rosenfeld by the Trustee in the Segal bankruptcy as a condominium  owned by Herman Segal [*Id.* at Lincoln 26, ¶ 12].  William J. Segal is the signatory on the checks drawn on that account.  [*Id.* at Lincoln 11, LN00124-125; Exemplars of William Segal's signature can be found throughout Lincoln 4, p. Bluth 00104, 113, 115, 118, 121-22, 124, 126-27, 129]

Lincoln received other premium payments on the Bluth Policy in the form of checks drawn on the account of Omega Venture Limited, Signature Bank Account number  *****1531 and bearing the signature of Herman Segal.  [*Id.* at Lincoln 11, LN00127, 132, 134-37; Exemplars of Herman Segal's signature can be found throughout Lincoln 23, Herman Segal's Bankruptcy Schedules.]  Omega Venture Capital LTD is identified in the Adversary Complaint

filed against Rosenfeld as a bank account name used by Herman Segal.  [*Id.* at Lincoln 26, p. 13.]

The Bluth Policy was almost continually in grace with lapse pending during the period that Rosenfeld was the Trustee for the Bluth Trust.  [*Id.* at Lincoln 12 (25 grace notices for the period July 2010 to March 2014)]  On December 23, 2013, Lincoln sent a grace notice indicating that the policy would lapse if a premium payment of $21,715.41 was not received by January 27, 2014. [*Id.* at Lincoln 12, p. LN00172]  Lincoln subsequently received a check in the amount of $21,800 drawn on the Alpha Beta Omega account and signed by William Segal.  That check was subsequently returned by the bank for insufficient funds.  [*Id.* at Lincoln 13]  Rosenfeld acknowledged that no other payment was made prior to January 27, 2014, and, therefore, that Lincoln did not receive the funds required to keep the Bluth Policy from lapsing prior to that date. [*Id.* at 178:7-179:23]

Lincoln sent several other grace notices in January and February.[6]  [*Id.* at Lincoln 12, pp. LN00173-174]  No payment was made in response to the January grace notice.  In response to the February grace notice, a final premium payment was made on the Bluth Policy on March 27, 2014, via a wire from 26 Investment LLC, located at 2611 Avenue S in Brooklyn New York. [*Id.* at Lincoln 11, p. LN00122]  The registered owner of that property at the time of the payment was Alan Spiegel.  [See Title Records, available at http://nycprop.nyc.gov/nycproperty/statements/soa/jsp/PaymentCoupon.jsp?statementId=213412339. ] Rosenfeld identified Spiegel as "an acquaintance of mine" with whom he had in the past been in "discussions to acquire some policies."  [*Id.* at 191:15-192:15]  Spiegel is also someone who

---

[6] Lincoln had initially applied the January 2014 payment to the Bluth Policy before it was bounced by William Segal's bank.  The delay between the receipt of the check and the notice that it was dishonored caused Lincoln's system to continue to generate grace notices for a period thereafter.  [*Id.* at Lincoln 14, 20]

had a "relationship" with William Segal and Rosenfeld testified that Spiegel and Segal had discussion about involving Spiegel as an "investor" in the Bluth Policy.  [*Id.* at 192:19-193:11]

Because the bounced check had never been replaced, the wire received March 27 was applied to the premium deficiency identified in the December grace notice  and the Bluth Policy immediately reentered grace for the period beginning in January.  [*Id.* at Lincoln 14, 20]  On March 29, 2017, Lincoln issued a new grace notice identifying the need to pay $21,800.15 by April 29, 2014 to prevent the policy from lapsing.  [*Id.* at Lincoln 11, p. LN00175]  Rosenfeld conceded in his deposition that no payment was made in response to this grace notice.  [*Id.* at 170:18-172:7]   On May 10, 2014, Lincoln sent written notice that the Bluth Policy had lapsed for non-payment of premium.  [*Id.* at Lincoln 11, p. LN00176 ]

After the policy lapsed, Rosenfeld signed a letter that contested the lapse.  [*Id.* at Lincoln 16]  The letter was actually prepared by an entity known as Track Life which Rosenfeld believed was engaged by Alan Spiegel; William Segal asked that Rosenfeld have the letter prepared and Spiegel directed Rosenfeld to sign the letter.  [*Id.* at 185:20-186:7; 196:7-198:10; 199:7-23 and Lincoln 17 and 19]   William Segal and Rosenfeld both reviewed the letter.  [*Id.* at 188:23-189:20]  Rosenfeld testified that he also reviewed with Segal the letter that Lincoln sent to him in response explaining why the Bluth Policy had lapsed.  [*Id.* at 200:25-202:20]

Following the receipt of Lincoln's explanation of the lapse, Rosenfeld met with an actuary referred to him by William Segal to review the lapse.  [*Id.* at 216:20-217:12]  Rosenfeld discussed with Segal what Rosenfeld had been told by the actuary.  [*Id.* at 218:12-14]  Rosenfeld ultimately did not hire the actuary and purported not to recall his name or address.  [*Id.* at 217:5-23]

With respect to this lawsuit, Rosenfeld testified that he had a number of discussions about the lawsuit with William Segal before it was filed.  [*Id.* at 128:4-11; 132:20-24]  Rosenfeld testified that he and Segal "possibly" discussed what law firm to use for the lawsuit.  [*Id.* at 204:18-21]  Rosenfeld also testified that the only person he told before filing suit was William Segal.  [*Id.* at 138:20-139:2]  As noted above, however, Rosenfeld refused to answer questions about the substance of those conversations on the basis of the attorney-client privilege.

Rosenfeld testified that he also discussed the lawsuit, as well as suing William Segal, with an "investor," Joel Wertzberger, who was another client of Rosenfeld's.  [*Id.* at 135:7-19]  As with questions about his conversations with William Segal, Rosenfeld refused to answer questions about the substance of his conversations with Wertzberger.  [*Id.* at 135:21-137:3; 146:23-148:8]  Rosenfeld also invoked the attorney-client privilege to avoid answering the question of whether Wertzberger had any interest in the Bluth Policy or the outcome of this lawsuit.  [*Id.* at 137:4-7, 137:21-25]  Rosenfeld did admit, however, that Wertzberger was the "investor" who was paying the fees of the law firm representing Rosenfeld in this action. [*Id.* at 139:21-140:6]  Rosenfeld testified that he was not the person who asked Wertzberger to pay the legal fees and he did not know who was.  [*Id.* at 146:18-22]  Rosenfeld also admitted that Wertzberger has "a relationship" with both William Segal and Herman Segal.  [*Id.* at 148:9-21]

## LEGAL ARGUMENT

### POINT I

### REMAND IS IMPROPER UNDER 28 U.S.C. §1447(E) AS PLAINTIFF'S SOLE MOTIVE IN ADDING SEGAL AS A DEFENDANT POST-REMOVAL WAS TO DEFEAT DIVERSITY

This action was removed at a time when there was indisputably complete diversity; the sole parties were Plaintiff, a New York resident, and Lincoln National, a company alleged to be

-12-

incorporated in either Indiana or North Carolina with its principal place of business in either North Carolina or Pennsylvania.  [ECF Docket No. 1, Complaint, ¶ 4]  Plaintiff's Motion to Remand is premised upon an Amended Complaint, filed only <u>after</u> the matter had been removed, which purports to join a non-diverse defendant.  Plaintiff's various arguments concerning fraudulent joinder and the irrelevance of his intent to defeat diversity jurisdiction are thus inapposite.  "Fraudulent joinder analysis is only appropriate in determining the propriety of removal." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1012 (3d Cir. 1987).  In contrast, §1447(e) governs applications for remand where, as here, the plaintiff joined the party defeating diversity after a proper removal of the action to federal court. *McGee v. State Farm Mut. Auto. Ins. Co.*, 684 F. Supp. 2d 258, 261 (E.D.N.Y. 2009).

28 U.S.C. § 1447(e) provides: "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." Pursuant to section 1447(e), the Court can and should address Plaintiff's Motion to Remand by denying joinder, and removing the non-diverse party, notwithstanding the Magistrate's decision to permit the filing of the Amended Complaint.  *See e.g. McGee v. State Farm Mut. Auto. Ins. Co.*, 684 F. Supp. 2d 258, 263 (E.D.N.Y. 2009); *see also Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 762 (7th Cir.2009) (district judge can reconsider an earlier decision by magistrate judge allowing joinder of non-diverse parties, when defendant did not initially oppose amendment and magistrate judge didn't consider section 1447(e)); *Bailey v. Bayer CropScience L.P.*, 563 F.3d 302, 307–08 (8th Cir. 2009) (court can reconsider an earlier order allowing joinder, when earlier decision did not consider § 1447(e)).

Under section 1447(e), the decision whether to allow post-removal joinder to defeat diversity is a matter within the Court's discretion. *Moncion v. Infra–Metals Corp.*, 2002 WL

-13-

31834442, at *2 (S.D.N.Y. Dec. 18, 2002). Despite the policy in favor of joinder, joinder of a party "should not be as freely given" when it would deprive the court of jurisdiction." *Amon v. Nelson*, 1992 WL 8337, at *2 (S.D.N.Y. Jan. 15, 1992). Courts must ensure that Plaintiff did not join a non-diverse party to "embark[] purposefully on post-removal steps designed exclusively to foster remand." *Id.* The "oft-stated general rule" is that a plaintiff "cannot act so as to divest a court of jurisdiction over a case that has been properly removed." *Shaw v. Munford*, 526 F. Supp. 1209, 1213 (S.D.N.Y. 1981); *see also Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1012 (3d Cir. 1987) (recognizing "the long-settled (and salutary) policy that a plaintiff cannot artificially force a retreat to the first (state) forum by embarking purposefully on post-removal steps designed exclusively to foster remand"). "Indeed, when joinder will necessitate a remand to state court, a trial court should pay particular attention to the motive underlying the plaintiff's motion because he may well be inclined to add a new defendant only to have his action remanded to the state forum, the one that he had originally chosen as best suited to his purposes." *McGee*, 684 F. Supp. 2d at 263 (E.D.N.Y. 2009) (internal quotations omitted).

Thus, remand of a properly removed action should not be permitted under section 1447(e) where Plaintiff's sole motivation for the joinder of the non-diverse was to deprive the court of jurisdiction. *McGee,* 684 F. Supp. 2d 258, 264–65 (E.D. N.Y. 2009) (denying motion to remand where amended complaint was filed contemporaneously with motion to remand, and plaintiff was aware of the existence and relevance of additional defendants at the time of the original complaint, "driv[ing] the Court to conclude that [plaintiff] had no independent reason for joining the additional defendants apart from a desire to destroy the Court's diversity jurisdiction and for the specific purpose of forum shopping"); *Nazario v. Deere & Co.*, 295 F. Supp. 2d 360 (S.D.N.Y. 2003); *Aries Ventures Ltd. v. Axa Fin. S.A.*, 696 F. Supp. 965, 970 (S.D.N.Y. 1988);

-14-

*accord Boyd v. Diebold, Inc.*, 97 F.R.D. 720, 723 (E.D. Mich. 1983); *Syme v. Rowton*, 555 F. Supp. 33 (D. Mont. 1982); *Pacific Gas & Electric Co. v. Fibreboard Products*, 116 F.Supp. 377 (D.Cal. 1953).

The court in *Gursky v. Northwestern Mut. Life Ins. Co.*, 139 F.R.D. 279, 282 (E.D.N.Y. 1991) (citations omitted), described four factors that should be considered when determining whether post-removal joinder would comport with principles of fundamental fairness: "(1) any delay, and its reasons, in [amending] (2) any resulting prejudice to the defendants, (3) the likelihood of multiple litigation, and (4) the plaintiff's motivation in [amending]."  This analysis has been followed in subsequent cases within the Second Circuit. *McGee*, 684 F. Supp. 2d at 263 (E.D.N.Y. 2009) (collecting cases).

Here, Plaintiff offers no explanation for the delay in naming Segal as a defendant. Plainly, the facts which form the basis for the allegations of the Amended Complaint relating to Segal were known to Rosenfeld at the time of the filing of the original Complaint.  Rosenfeld admitted in his deposition that he knew the facts averred in paragraphs 8, 18, 19, 84, 85, 86, 87 and 88 of his Amended Complaint.  [Ex. A at 209:16-213:5]  Rosenfeld asserted that he was not aware of the facts averred in paragraphs 89 and 90, which aver that Plaintiff was wrongly advised that the payment made on March 27, 2014 was sufficient to keep the policy from lapsing, but could not identify what information he received between the filing of the original Complaint and the filing of the Amended Complaint that would have formed the basis for those averments.  [*Id.* at 214:23-215:12]  In truth, the information that relates to the averments of paragraphs 89 and 90 was contained in Lincoln's letters explaining the lapse, which Rosenfeld received over two years before he filed the original Complaint.  [*Id.* at Lincoln 14 (explaining the application of the bounced check and the reason the policy went immediately back into grace

-15-

following receipt of the March 27 payment) and Lincoln 20 (enclosing annual statements, the relevant grace notices and the bounced check and again explaining why the policy went back into grace immediately upon receipt of the March 27, 2014 payment) ]

Rosenfeld ultimately resorted to testifying that he did not sue Segal initially on the advice of his counsel and that he elected to file the Amended Complaint naming Segal on the advice of his counsel.   [*Id.* at 218:18-219:4]   Plainly, and indisputably, the only thing that changed between the filing of the original Complaint and the filing of the Amended Complaint was that Lincoln removed the lawsuit.   The addition of Segal solely to defeat this Court's jurisdiction is precisely the type of forum shopping that courts have repeatedly found is improper under section 1447(e).  This Court should do the same.

## POINT II

### REMAND IS IMPROPER AS PLAINTIFF'S ADDITION OF SEGAL AS A DEFENDANT CONSTITUTES FRAUDULENT JOINDER

Even if this Court applies the more stringent fraudulent joinder inquiry reserved for jurisdictional review based upon the named parties at the time of removal under  section 1447(c), Plaintiff's motion to remand should be denied. In order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat diversity, the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court. *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998).  Although Lincoln needs only to satisfy one or the other standard to defeat remand, both standards are satisfied here.

-16-

Plaintiff concedes that outright fraud may be demonstrated by proof that Plaintiff's pleading contains some false set of facts.   [Plaintiff's Brief at p. 4]   As discussed below, Plaintiff's deposition testimony[7] is directly contrary to the allegations of the Amended Complaint that relate to Segal.[8]

Remand is also improper where a non-diverse defendant is joined in bad faith as a "sham or fraudulent device." *Arno v. Costa Line, Inc.*, 589 F. Supp. 1576, 1579 (E.D.N.Y. 1984). "Lack of a good-faith intent to prosecute a claim asserted against a non-diverse defendant may make joinder of that defendant fraudulent even though the claim is well founded." *Arriaga v. New England Gas Co.*, 483 F. Supp. 2d 177, 184 (D.R.I. 2007). *Accord In re Zyprexa Prod. Liab. Litig.*, 2008 WL 4561628, at *3 (E.D.N.Y. Oct. 10, 2008) (relied upon by Plaintiff and citing *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990) for the proposition that addition of a non-diverse party constitutes fraudulent joinder where the plaintiff has "no real intention in good faith to prosecute the action against the defendant or seek a joint judgment."); *see also Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 32 (3d Cir. 1985) ("Courts have found joinder to be fraudulent where there is . . . no real intention in good faith to prosecute the action against the defendant or seek a joint judgment"); *Boyer,* 913 F.2d at 111 (Third Circuit holding same); *Schwenn v. Seare, Roebuck & Co.*, 822 F. Supp. 1453, 1455 (D. Minn. 1993) (finding joinder was fraudulent "where the plaintiff has no real intention of prosecuting the action against the resident defendant."); *Doe v. Cutter Biological*, 774 F.Supp. 1001, 1003 (E.D.

---

[7] In analyzing whether subject matter jurisdiction exists, the Court may look to materials outside of the pleadings. *See Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006) ("Although [the district court's] ruling required [it] to look outside the pleadings, a court has discretion to do so when determining whether it has subject matter jurisdiction." (*citing Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir. 2002)); *see also Pampillonia*, 138 F.3d at 461–62 (looking to affidavits on removal petition to determine whether party had been fraudulently joined).

[8] Plaintiff's testimony also makes it clear that he has no colorable claim against Lincoln.

La. 1991) (holding that a defendant will be considered fraudulently joined "when plaintiff... does not intend to secure a judgment against that defendant"); *Alphonse v. Omni Hotels Management Corp.*, 757 F. Supp. 722 (E.D. La. 1991) (mere naming of non-diverse defendants does not alone defeat diversity for removal purposes; when plaintiff's actions do not indicate intent to proceed against non-diverse parties, action may be removable).[9]

### A. Plaintiff Does Not Have a Colorable Claim against Segal Because Plaintiff Has Not Sustained The Injury For Which He Seeks Damages From Segal

Although inarticulately plead, Plaintiff's Amended Complaint asserts a cause of action for misrepresentation against Segal. In New York, the damages recoverable on a cause of action for misrepresentation (whether negligent or fraudulent) are limited to damages for pecuniary

---

[9] Plaintiff's legal argument ignores the distinction between the motivation for joining a non-diverse defendant, and whether plaintiff has a good faith intent to prosecute its claims against the non-diverse defendant. *See Arriaga*, 483 F. Supp. 2d at 184 (there is a "distinction between a plaintiff's motive for joining a non-diverse defendant and the plaintiff's belief regarding the basis for his claim or his intent with respect to prosecuting the claim"). The vast majority of the cases referenced by Plaintiff address solely whether a Plaintiff's motive is properly considered in adjudicating a claim of fraudulent joinder. *See Illinois Cent. R.R. Co. v. Sheegog*, 215 U.S. 308, 316 (1909); *Illinois Cent. R.R. Co. v. Sheegog*, 215 U.S. 308, 316 (1909) ; *Norwalk v. Air-Way Elec. Appliance Corp.*, 87 F.2d 317, 320 (2d Cir. 1937); *In re Propecia (Finasteride) Prod. Liab. Litig.*, 2016 WL 3541543, at *3 (E.D.N.Y. June 23, 2016); *O.M. v. CEC Entm't Concepts, L.P.*, 2016 U.S. Dist. LEXIS 28150 (E.D.N.Y. March 2, 2016) ; *Gerbo v. Kmart Corp.*, 2015 WL 6691603, at n. 3 (E.D.N.Y. Nov. 3, 2015); *B.N. ex rel. Novick v. Bnei Levi, Inc.*, 2013 WL 168698, at *3 (E.D.N.Y. Jan. 15, 2013); *Locicero v. Sanofi–Aventis U.S. Inc.*, 2009 WL 2016068, at *8 (W.D.N.Y. Jul. 10, 2009) ; *Kuperstein v. Hoffman-Laroche, Inc.*, 457 F. Supp. 2d 467, 470 (S.D.N.Y. 2006); *Cleary v. Boston Sci. Corp.*, WL 2689815, at *2 (E.D.N.Y. Sept. 18, 2006).

Plaintiff has identified two non-binding cases from the Southern District of New York wherein the district courts held that a lack of intent to prosecute is immaterial to a claim of fraudulent joinder. Respectfully, in those two decisions, one of which relies on the other, the Court incorrectly decided the law. In *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 3776385, at *3 (S.D.N.Y. June 17, 2015), the district court's analysis relied upon *Locicero*, 2009 WL 2016068, at *8, which addressed a Plaintiff's motive but not the lack of a good faith intention to prosecute. Likewise, *Zhaoyin Wang v. Beta Pharma, Inc.*, 2015 WL 5010713, at *13 (D. Conn. Aug. 24, 2015) relies upon the misinterpretation of the *Locicero* decision by the Court in *In re Gen. Motors*. As noted above, these two decisions also contradict case law from other courts within this Circuit and the overwhelming majority of decisions in other jurisdictions.

harm, i.e. the actual sum of money which was lost as a result of reliance on the misrepresentation. *See, e.g., Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 271, 933 N.E.2d 738, 742 (2010) ("In a fraud action, a plaintiff may recover only the actual pecuniary loss sustained as a direct result of the wrong"); *Mihalakis v. Cabrini Med. Ctr. (CMC)*, 151 A.D.2d 345, 346, 542 N.Y.S.2d 988, 989 (1st Dep't 1989) ("The cause of action for fraud should have been dismissed since it does not allege facts from which can be inferred any pecuniary, out-of-pocket losses as a direct result of the wrong").

The Amended Complaint seeks the following relief from Segal: "a judgment for damages for all premium payments made on the Policy, interest on those payments [and] legal fees." Amended Complaint at p. 12 [ECF Docket No. 10; Ex. A at Lincoln 22]  Rosenfeld testified that the Amended Complaint set forth all of the damages and relief the Trust was seeking.  [Ex. A at 261:18-262:4]   As a matter of law, Plaintiff cannot recover premium payments from Segal because Rosenfeld's testimony establishes that the Trust did not in fact make any premium payments and no trust assets were used to make any premium payments.  The Trust cannot state a claim against Segal for return of premiums that the Trust never paid in the first instance. *See e.g. Jackson Nat. Life Ins. Co. v. Ligator,* 949 F. Supp. 200, 204 (S.D.N.Y. 1996) (holding that only directly injured party has standing to assert misrepresentation claim). Similarly, the Trust can have no claim for legal fees where it is not actually paying legal fees.

### B.    The Averments Of The Amended Complaint Are Demonstrably False

Rosenfeld testified that he reviewed the Amended Complaint prior to its filing to confirm its accuracy.  [Ex. A at 209:8-15]  While the Amended Complaint is vaguely plead, paragraphs 88 and 91, both part of the newly added claim against Segal, aver that the "**Trust made**" premium payments.  The Amended Complaint also avers, at paragraph 94, that "Over the life of

the Policy, **the Trust paid** in excess of one million dollars in premiums to Lincoln." (Emphasis added)  As discussed above, those averments are a necessary element of the claim asserted against Segal.  Those allegations are demonstrably false in light of Rosenfeld's sworn testimony that the Trust never made any payments of premium and that no Trust assets were used to pay Premium.  On the basis of Rosenfeld's deposition testimony the Court can and should find that Plaintiff's Motion to Remand should be denied for fraud in the pleadings.[10]

### C.     Plaintiff's Conduct Evidences That He Has No Good Faith Intention Of Prosecuting His Claim Against Segal

As discussed above, Rosenfeld and Segal have a longstanding relationship and had an intimate working relationship regarding the Bluth Trust and the Bluth Policy.  Indeed, Segal is fairly understood to have directed Rosenfeld in his duties as Trustee and Rosenfeld characterized Segal as his client for that purpose.  The relationship extended to the planning for and analysis of the current suit against Lincoln.  There is considerable evidence that the entire transaction involving the Bluth Trust and the Bluth Policy was a sham, orchestrated by William Segal and his father Herman Segal, intended to defraud Lincoln and conceal conduct that violates New York insurable interest requirements.  There is also considerable evidence that Rosenfeld was a willing participant in this sham.  There is no basis upon which the Court could find that Rosenfeld's current "claim" against Segal is anything other than a further sham designed to defeat the Court's jurisdiction. Rosenfeld cannot credibly claim that he is pursuing a claim against Segal and at the same time repeatedly invoke the attorney client privilege to shield his discussions with Segal about the Bluth Trust, the Bluth Policy and this lawsuit from disclosure.

---

[10] Rosenfeld's testimony raises clear issues regarding compliance with Fed. R. Civ. Proc.  11, both by Rosenfeld and his counsel.

The chronology of events is also instructive.  As noted above, Rosenfeld did not seek to sue Segal until after Lincoln had removed the action.  The Amended Complaint was filed on July 6, 2016.  [ECF Docket No. 10]  Segal executed a Waiver of Service on September 27, 2016 [ECF Docket No. 13],  but an Answer was not filed within the 60 day period allowed.  No request for an extension of time was ever made and no efforts were made by Rosenfeld to default Segal.  Segal finally filed an answer on December 29, 2016 [ECF Docket No. 19], one day before Rosenfeld was required to file his Motion for Remand pursuant to the schedule previously established by this Court.

Subsequent to the filing of the Motion to Remand, and notwithstanding what was then a fact-discovery cut-off of January 20, 2017, Rosenfeld served no discovery on Segal.  Lincoln, in contrast, did serve discovery on Segal, in the form of a notice to appear for deposition and produce documents, as soon as he appeared. [Ex D]  Segal did not seek a protective order but has nonetheless refused to proceed with discovery, citing the pendency of the Motion to Remand. [Ex. E]  Lincoln has initiated the process it must follow to compel discovery from Segal. [Ex. F]  Plaintiff, in contrast, has not opposed Segal's refusal to proceed with discovery.

On January 16, 2017, Lincoln deposed Rosenfeld at the offices of his counsel.  Although Segal's counsel is based in New York, he elected to attend the deposition by telephone.  Segal's counsel asked no questions of Rosenfeld and spoke only to assert the attorney client privilege that purportedly exists between Rosenfeld and Segal.  [Ex. A, throughout]

Given the facts of record, the failure to name Segal as a defendant originally and the undisputed failure of Plaintiff to pursue his claim against Segal to date, the Court can and should deny the Motion to Remand on the grounds that Plaintiff has no good faith intent to prosecute the case against Segal.

-21-

## POINT III

## PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES SHOULD BE DENIED

Plaintiff cites to no legal authority, and our research could not locate any, permitting an award of attorneys' fees in the context of a motion to remand following post-removal joinder of a non-diverse defendant. Fees are plainly inappropriate in that context because  Plaintiff's motion to remand is necessitated by his own failure to name Segal as a defendant at the outset of litigation in state court, not by any action on the part of Lincoln.

Even if the Court applies the standard for fee awards permitted under § 1447(c), Plaintiff's request for fees should be denied. "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). "If a defendant's grounds for removal are not clearly barred by established federal law, then an award of attorney's fees and costs is improper." *Little Rest Twelve, Inc. v. Visan*, 829 F.Supp.2d 242, 245 (S.D.N.Y.2011) (citing cases). The "mere fact that the defendant fail[ed] to carry his burden" does not justify an award of fees. *Kuperstein*, 457 F. Supp. 2d at 472 (internal quotation marks and footnote omitted). Here, it is undisputed that diversity jurisdiction existed at the time of removal. Thus, it uncontroverted that Lincoln had an "objectively reasonable basis" for seeking removal. Moreover, for the reasons set forth above, even if fees were recoverable in the context of a motion to remand following joinder of a non-diverse defendant, Lincoln has an objectively reasonable basis to oppose Plaintiff's Motion to Remand. Accordingly, Plaintiff's request for fees should be denied.

## CONCLUSION

For the foregoing reasons, Defendant Lincoln National Life Insurance Company respectfully requests that the Court deny Plaintiff's motion to remand.

Respectfully submitted,

Dated: Newark, New Jersey      **SAUL EWING LLP**
       January 20, 2017

By: */s/ Valerie G. Pennacchio*
    Paul Hummer (admitted *Pro Hac Vice*)
    Valerie G. Pennacchio
    One Riverfront Plaza
    Suite 1520
    Newark, New Jersey 07102
    vpennacchio@saul.com
    Tel: (973) 286-6700
    Fax: (973) 286-6800

    *Counsel to Defendant The Lincoln
    National Life Insurance Company,
    improperly plead as the Lincoln Life
    Insurance Company*

## CERTIFICATE OF SERVICE

I, Valerie G. Pennacchio, hereby certify that on January 20, 2017, a true and correct copy of Defendant The Lincoln National Life Insurance Company's Opposition to Plaintiff's Motion to Remand, and supporting papers, were served upon the following counsel of record via e-mail and regular mail:

> Mr. Ira Lipsius
> Ms. Cheryl D. Lipsius
> Lipsius-BenHaim Law, LLP
> 80-02 Kew Gardens Road, Suite 1030
> Kew Gardens, NY 11415
> ilipsius@lipsiuslaw.com
> clipsius@lipsiuslaw.com
>
> Joseph J. Schwartz
> Law Office of David Fleischmann, P.C.
> 2233 Nostrand Avenue, Third Floor
> Brooklyn, New York 11210
> joseph@dfleischmann.com

Dated: Newark, New Jersey
      January 20, 2017

SAUL EWING LLP

By: */s/ Valerie G. Pennacchio*
    Paul Hummer (admitted *Pro Hac Vice*)
    Valerie G. Pennacchio
    One Riverfront Plaza
    Suite 1520
    Newark, New Jersey 07102
    vpennacchio@saul.com
    Tel: (973) 286-6700
    Fax: (973) 286-6800

*Counsel to Defendant The Lincoln National Life Insurance Company, improperly plead as the Lincoln Life Insurance Company*